35 C.C.P.A. (Patents)

## Application of DELANEY.

### Patent Appeals No. 5377.

Court of Customs and Patent Appeals.
Feb. 10, 1948.

Barnes, Kisselle, Laughlin & Raisch, of Detroit, Mich. (John M. Kisselle, of Detroit, Mich., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (H. S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and HATFIELD and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

The Board of Appeals of the United States Patent Office having affirmed the decision of the Primary Examiner rejecting the claim numbered 1 in appellant's application for patent entitled "Method

and Apparatus for Manufacturing Twist Drills," this appeal was taken seeking review and reversal of the board's decision.

Seven method claims stand allowed. The appealed claim which is also a method claim reads: "1. In the method of making twist drills the steps which comprise heating bar stock of multiple drill length to a temperature high enough to facilitate mechanical working, forming longitudinal flutes in the full length of said stock and simultaneously forming beads along alternate edges of said flutes, and twisting said fluted stock by torsional forces applied to opposite ends of said stock to drill form of uniform cross-sectional shape throughout its length."

The claim was rejected as being unpatentable over prior art. A large number of reference patents were cited, first and last, relative to the many claims which were presented, but only three of them relate to the rejection of claim 1, viz.: Taft, 430,792, June 24, 1890; Moore, 432,636, July 22, 1890; Houser, 651,356, June 12, 1900.

Samples, some 6 or 8 inches in length, stated to be illustrative of finished twisted drills, were exhibited at the hearing before us. The metal bars from which the drills are made are many times longer than the finished drills. After the bar has been twisted it is cut into drills of the length desired.

In operation the bar, which is relatively flat, is heated to a temperature high enough to render the metal mechanically workable and is then fluted longitudinally from end to end. Simultaneously, beads are formed along alternate edges of the flutes. The bar, or stock, after being so treated is twisted to drill form of uniform cross-sectional shape throughout its length by torsional forces applied to its ends. After being so processed it is ready to be cut into drill lengths.

It is noted that several of the allowed claims provide the application, if necessary, of a blast of air to a portion of the fluted stock, while the operation is progressing, to substantially equalize the temperature along the entire length of the bar so that the twist will be uniform. The specification states that "An ordinary air hose has been found quite satisfactory for this purpose."

The air-blast feature, however, is not a part of the appealed claim. Other limitations present in some of the allowed claims which are not expressed in the appealed claim are those of rolling the twist stock to reduce it to the desired outside diameter, cutting the stock into lengths, hardening the twisted lengths, and grinding off some of the exterior portions of the beads.

The omission of those limitations may have broadened claim 1 beyond the allowed claims, but whether the latter were allowed because of those particular limitations is not definitely shown by the record.

It appears that at one time claim 1, as then drawn, was rejected as being vague and indefinite, but amendments were made to it which, the examiner states, overcame that ground of objection. The examiner held, however, that by the amendments the claim had been so broadened that he did not consider it "patentable over patent to Taft, especially in view of patents to Houser and Moore."

The patent to Moore, which was issued in 1890 and which is in the twist-drill art, seems to have been cited only for the purpose of showing that it is old to heat metal blanks before subjecting them to operations which change the shape of the blank by causing the metal to flow. That such heating is old is not questioned by appellant, and the Moore patent requires no further consideration.

It is contended on behalf of appellant that there are in claim 1 three steps which patentably distinguish it from the prior art cited, viz.: (1) the making of the longitudinal flutes along the entire length of the stock bar; (2) the forming of beads along the alternating edges of the flutes, and (3) the twisting of the fluted stock by torsional forces applied to each of its ends.

The patent to Houser, dated June 12, 1900, was cited with respect to the first step. It is for a die for forming twist-drills; not for the drills themselves nor for a method of making them. Houser does not produce twist-drills by a twisting operation of any character, but draws the

stock blank through a hardened steel die (or a series of such dies) which cuts spiral longitudinal grooves in the stock over the entire length of the stock, or over such portion of it as may be desired.

The drill stock or bar disclosed by the Taft patent, which was also issued in 1890, is of the length of the drill which it is desired to make—not of "multiple drill length"—and the longitudinal flutes do not run the full length of the stock bar. Judging from the drawings they run about three-fourths the length and the remainder constitutes a smooth cylindrical end which we suppose may be inserted in a holding means when it is desired to use the drills. The patent discloses a blank of drill length having opposite longitudinal grooves, called "clearing grooves" in the specification, with opposite longitudinally flattened or depressed surfaces between the grooves. The blank is twisted to spiral form, the twisting method not being disclosed. After the twisting is done the metal is compressed at the cutting corners or edges of the spiral grooves. The examiner and the board concurred in holding that the cutting corners or edges are the equivalent of the beads which appellant forms at the corners or edges of his flutes.

Appellant does not acquiesce in that holding but insists that "Taft's cutting edges cannot be referred to as beads in the same sense as applicant's."

The board expressed its views upon the "length" and "bead" questions as follows: "In view of the fact that Houser shows making twist drills of multiple drill length it would not amount to invention to apply the Taft method of making twist drills to stock of multiple drill length or to continue the flutes to the ends of the stock. Taft forms acute angled corners along the edges of the flutes and compresses these corners to compact the metal and thus improve the lasting qualities of the cutting edges of the drill. It seems to us the acute angled corners of Taft are the equivalent of the beads which applicant forms at the corners or edges of the flutes."

Taft's specification recites that: "The twisting of the drill-blanks when of small and medium size is commonly performed

without the application of heat, and in that case the metal at the cutting corners or edges c c of the clearing-grooves will be deteriorated by the stretching tension to which it has been subjected in the operation of twisting, and it is the object of my improvement to restore the original quality of the metal at the said cutting-corners, and I accomplish this result by compressing the said corners in suitable dies or between suitably-grooved rolls, whereby the metal at the cutting corner or edge c will be compacted, as shown in Fig. 6, thus improving the lasting qualities of the cutting-corner of the drill, and at the same time reducing the drill to the proper standard size."

Upon the basis of such disclosure, appellant argues in its brief: "The edges are merely compressed after twisting to eliminate the deteriorating effects of the stretching tension to which they are subjected in the twisting operation and are merely equivalent to the cutting edges of ordinary fluted drills. Applicant on the other hand, actually forms projecting portions along the edges of the flutes before the stock is twisted and provides an excess of metal along these edges which may be more accurately referred to as beads. Taft therefore does not disclose 'simultaneously forming beads along alternate edges of said flutes.'"

There is no reference cited which teaches twisting the stock by applying torsional forces at its opposite ends. As has been stated, drills were not produced under the Houser patent by twisting (although the patent, long since expired, referred to them as "twist-drills") but by cutting the grooves with a die or a series of dies.

As for the Taft patent, it does not disclose what method of twisting was used.

Webster's New International Dictionary defines torsion as: "1. Act of turning or twisting, or state of being twisted; the twisting or wrenching of a body by the exertion of a lateral force tending to turn one end or part of it about a longitudinal axis, while the other is held fast or turned in the opposite direction."

The same authority gives various definitions of "twist," the mechanical definition

being: "a Torque or torsional stress applied to a body, as a rod or shaft. b Torsional strain."

So, "torsion" and "twist" are closely related in meaning when used in a mechanical sense, and we assume that the twisting operation taught by the Taft patent was a torsional strain.

We are not disposed to assume, however, that that patent contemplated the application of torsional forces at both ends of the drill stock.

We think the following statement from appellant's brief is obvious: " * * * if torsial forces were applied to the opposite ends of a heated blank of Taft's type, the resultant drill would not have a uniform pitch and cross-section throughout its length because the resistance offered by the greater cross-sectional areas of his blank would be greater than the resistance offered by the portions of the blank having a smaller cross-section. The twist would necessarily be greatest at the end of the fluted portion and gradually diminish in the direction of the solid end."

The Primary Examiner did not seem to regard the effect so stated as significant because, he said, "there is no reason for twisting the unfluted part of the Taft article at all, and it is immaterial whether or not the unfluted portions of the Taft article are twisted at all."

We fail to perceive the force of this statement. Appellant's method was for an article different from the article of the Taft patent. It is not supposed that it is desirable to twist the unfluted end of the Taft drill. The tool might be destroyed in the making if the unfluted portion were turned in a direction opposite the twist given the fluted portion. In appellant's plan it is essential to the production of a workable structure that the ends be twisted in opposite directions, and it seems to us that the step of extending the flutes the entire length of the stock is essential, as appellant contends, in obtaining "a uniform pitch and uniform cross-section in the twisting operation."

In his brief and oral argument before us counsel referred frequently to the alleged large commercial success of his invention. There is, however, no proof of such success in the record and we have given that argument no weight. Applicants for patents should understand that in order to have commercial success taken into consideration there should be proof of it in the record.

There is no question as to either the utility of the method or the product resulting from the use of the method. The prior art cited does not anticipate features which have been explained and commented upon and which seem to us to be important and inventive.

For the reasons indicated, the decision of the board affirming that of the Primary Examiner is reversed.

Reversed.

By reason of illness, O'CONNELL, Judge, was not present at the argument of this case and did not participate in the decision.